The next case call for oral argument is in re Marriage of Stern. Council, whenever you're ready, you may proceed. There has been a motion filed just a little while ago. We'll take it with the case. May it please the court. I'm Richard Clayton. I'm an attorney for appellant Richard Stern. He's also a cross appellee, so I'll deal with both issues at the same time, if I may. The main thing is our appeal involves a modification of custody, a trial to a court of appeals, a court for modified custody awarded to Mrs. Stern from Mr. Stern. We argue that there was not enough evidence to do that, that the standard of clear and convincing evidence wasn't met, that the various paragraphs of the statute involved are to be each one to be met, and that they aren't all met, clear and convincing facts that have arisen since the prior judgment or were unknown, change in circumstances, and necessary to serve the best interest. I'm sure that you don't want to hear me read my brief. The facts are that Mrs. Stern had custody after the divorce. It was uncontested as far as custody. There was an appeal that she filed on financial issues. I guess it both did, and the court ruled on that. Within a month or so, she wanted permanent maintenance. It was denied. It was rehabilitated. Within about a month after that Rule 23 decision, she filed a motion to review maintenance. It was supposed to be reviewed in February of 2007, so she was just making sure she could enable that review. Mr. Stern filed, or Dr. Stern filed, discovery. We had a lot of issues about getting discovery. We felt her mental history, at least her medical records, were an issue, and there was a lot of problems in getting them. But she, Dr. Stern filed a petition to modify custody at that point. It was eventually granted, uncontested, at the final end, but there were reports of Donna Anderson, who the court ordered to do a psychological report of the whole family, and that's one of the motions. Somehow or another, that is not in the common law record when I received it from the court, but it's mentioned in the judge's order in two places. One where he ordered it done, and one where he adopted it as a part of it in his order, and it's mentioned in the depositions of the different doctors. So I ask that the record be supplemented by having it included. There was also an examination by Dr. Robert Clifford at that time to make a recommendation about custody as well. Our position is that at that time, Mrs. Stern had a pretty bad relationship with the children. The custody was changed to Dr. Stern. Then we come back three years later, and she asks to change custody back to her. So we feel like that she has to show that somehow that those circumstances have changed and that they're better, or that it's more in her favor. And she has not provided any kind of—nobody has interviewed the children on her behalf or interviewed Dr. Stern on her behalf, made any kind of determination, other than she's had a doctor and psychiatrist who have given opinions about her anxiety and her ability to work and her ability to parent, but they don't have any information about anybody else in the family. We don't feel like that she's met the burden of even counteracting those negative things that happened when the custody was changed away from her. We feel that there are a couple things she's claimed. The main thing she's claimed really is that David, their son David, who is now 18 but was 17 when this was filed, has been in a lot of trouble. He did shoplifting. He was found to have—eventually found to be doing something that seemed to be distributing or selling marijuana and or maybe Vicodin. When this was found out, his cell phone was confiscated. They found about a half a cup to a cup of marijuana. And he was—Dr. Stern enrolled him in a gateway program with intensive counseling and weekly testing and long-period things was all detailed in there. But prior to that, David had been having trouble. Even during the first phase of the divorce, Dr. Stern's visitation had been restricted at David's instance. And then in the time when the custody was changed away from Brenda, David was the primary problem. And Brenda tried to say, well, all the problems happened after he changed back to—when he changed to Richard. But eventually in a cross-examination, as Tom mentioned in the brief, it turns out David had just continued to have these problems basically his whole—the whole time that the court had been involved with him. He was depressed. He was not doing his activities. He was doing lousy in school while she had custody. Then she says, well, now when Dr. Stern got custody, he was depressed. He was doing lousy in school and not doing his activities, but that's Dr. Stern's fault. And to some extent, the trial court bought into that. Thinking that Dr. Stern must not have been supervising him well enough. And I think that's the main thing that the doctor—that the court may have used for his determination. But in fact, the only evidence of that is Brenda's. When I tried to outline in my brief as to why Brenda's testimony is not credible and involves repeatedly answering the same question with different answers, not realistically assessing the situation, being hostile to Dr. Stern, that interfered with her relationship with the children. Also, and I don't think it's dumb, the—the— He did consult with Dr. Clipper intermittently ever since the custody was changed. He was ordered to do that to try to help mend the relationship with—of David with Brenda. And he did, and then he consulted back with Dr. Clipper when Dr. Stern decided that maybe David was using marijuana and had testing and then found positive and took him back to Dr. Clipper. Dr. Clipper got advice, imposed discipline, checked him again and found again marijuana. He claimed that he was only—had done it once or twice with his friends and that was looking like it wasn't true. And then they found the telephone. This was over a period of a phone call. He made a phone call to the wrong—to the wrong person. And there was something, a text message about either marijuana or Vicodin on the phone call. And that's how Dr. Stern found out that it was significantly a lot more serious. However, there's no signs that anybody ever who saw David or under influence of any drug found him to be— Judge McHaney said he was an addict and that Richard enabled him to be an addict. Well, you know, that's just totally gratuitous. Dr. Stern is the one who discovered the problem. Dr. Stern is the one who did something about it. He went through the gateway program and he was released. And he's now graduated from high school and he's in SIU attending college. But I say that the things that happened with David are not a change of circumstances at all. They're a continuation of David's problems that he's had for the whole time that this case has been on file. I didn't look at my watch sufficiently. But the other thing that's gone on is Brenda filed an appeal requesting that—well, the judge denied her maintenance. It was rehabilitative maintenance, the judge said, and she didn't make a serious effort or even unreasonable effort to try to get employed. By the time the review was set up, it had been more than about three years since the petition had been filed. And they haven't shown what she did to try to find employment. But to me, it's nothing until the review period had already come to pass. And then she's got medical records that show that she was anxious and had excessive anxiety and couldn't work. You find, I believe, that her—Dr. Canestrero is her personal physician and her psychiatrist, Dr. Lipschitz, both were very bought into things Brenda said and no information other than what Brenda said. And the depositions are here. You can see them. I feel that both Canestrero and Lipschitz's depositions are just not persuasive at all. And that's what Judge McHaney found. It appears that Lipschitz was hired specifically for the purpose of being a witness in the review of maintenance. And then when the custody petition was filed, she sort of switched to being a witness for the custody, and she wrote a letter that said this is certainly going to be a great mother. And to no reason she couldn't have custody of the children. Both of the patients in their testimony, Brenda's patients, said she could do anything that was appropriate to take care of children, even troubled teenagers. It would not cause her any stress. She could drive to southern Missouri repeatedly and back, even at night. She could deal with police problems. She could deal with maintaining a couple-acre yard, being a gourmet chef, having a permanent relationship with another friend, having lots of guests over. Everything in the world she could do, except she just can't work. And there's no indication she tried to work at any time whatsoever until the late summer of 2009, when the trial was scheduled that fall. And then she worked three part-time days giving injections at Walmart, made something like $280 over a period of six or seven years. She claims that she tried 50 to 100 times to find some other job, but there was a specific interrogatory asking her to detail each one, all the details about it. It's cited in the brief. And it turns out that in the first part of 2007, there were maybe six that she applied to by mail. And in the latter part of 2009, there were about five that she applied by email. And she gave no other specifics except to say she tried 50 to 100 places. Well, I suggest that her credibility is not so good, and that's just another example of it. So we feel like the judge was right, that she's made no effort to be employed, that she is employable. She may have some degree of difficulty, maybe, that some people don't have. But I think that the vast majority of people who have a certain amount of anxiety work, and that she doesn't have the physical ailments that would stop her from working, and that her anxiety is not sufficient to stop her from working. I think I probably should just stop there. Can you give me some details about this custody? It started out joint with mom, and that was in 2005, and that lasted until 2007. Is that right? Correct. And then temporary custody was given to father. Did he get permanent custody in 2007? Yes, Your Honor. Temporary custody was given in March, I believe. 2007. And permanent was given in August. But the judge announced it. The parties announced some terms on the record. And then the lawyers could not get together to actually have a written order entered. And finally, we had to file a motion to compel the judge to enter the order that I have prepared in November. So the final custody change order was entered in November, but it was really effective in August. And that was the child was still alive with his father? Two children. Two children. Matthew is the only one that's an issue here. Matthew is the only one issue now. I didn't object to the two-year time period, if that's what you're thinking of, from when she filed her petition. Because, one, the custody was actually changed in March. And so by the time she filed her petition, it was February, two years later. It was close to two years. I felt that since the custody was with him continuously for almost two years and that it had been by agreement, although it was still an issue, that it was very close to two years and it wasn't any point to make her wait a month or to have it evidential. So do you know the date when she filed the petition to regain custody? I think it was in February of 2009. I'm not positive. But it was close to two years. So you didn't raise the issue? No, I waived it. I don't think we have any further questions. Thank you, Counsel. Thank you. Counsel? May it please the Court, Counsel, for the Ohio record, my name is Brad Denny. I represent the defendant, L.A. cross-appellant Brenda Stern. She's asking that this Court affirm the trial court decision granting her sole custody of the party's 13-year-old son, Matthew. This case was tried on May 1st, 2010. There was, in this case, a recorded testimony of four expert witnesses. All of the experts, save one, testified as to the parenting ability of Brenda Stern. None of these witnesses testified as to the parenting ability of Richard Stern. Proceedings in 2007, in which Don A. Edgerson and Robert Clipper were involved, we do not feel were relevant to this proceeding. Neither one of them were called as a witness. Neither one testified in this matter. In fact, neither one was called as a witness or testified in the 2007 matter. Additionally, I think it's poignant to point out that the plaintiff never called any witnesses, any lay witnesses, to support his testimony or to testify on his behalf in regards to the custody issue. The overwhelming evidence, we believe, supported a change of custody. In fact, first of all, it was clear that joint parenting was not working. Mr. Stern never filed any type of pleading asking for sole custody. And I think the Court recognized clearly that joint custody was not working with these people. The filer says he did file a petition to modify custody. No, he filed a petition to modify custody in the 2007 proceeding. I didn't understand on your unnumbered page in your argument that issue that you raised, that the plaintiff never filed a petition seeking sole custody. He had sole custody at that time. Did he not? No. They had joint custody, and Richard was the primary custodian. The joint custody arrangement had continued from 2005. The primary residential custodian had changed in 2007. The evidence that was presented in regard to Matthew was that he was 13 years old. He was in seventh grade. His grades had gone from A and B to B's and C's. He dropped out of both band and track in school. He was involved in no extracurricular activities. He had been caught shoplifting just prior to the trial, a device that could be used for drug use. There was noticeable changes in personality that were testified to by both parties. He was classified as being unhappy, sad, worried. He had stated to Brenda Stern that he was not interested in school anymore. He was often left at home alone by the plaintiff. David, the oldest, was having women sleep over at his house, even though he was 18 years old and still in high school. Matthew witnessed this behavior. A week after telling Brenda that this was occurring, Brenda found a condom in Matthew's wallet. The plaintiff said that it was okay for David to have sleepovers, even though he was 18 years old. The plaintiff said that was perfectly good behavior. The plaintiff himself has a girlfriend at home that sleeps over a number of times. The plaintiff told Matthew just prior to his interview with the guardian of the island that he would be moved to Colorado if he lost custody. This made Matthew very upset, fearful of losing his father. There was also an agreement that was entered into evidence and exhibit that Matthew had prepared, whereby the plaintiff was going to pay Matthew $10,000 when he turned 16 and got good grades. Again, this was just prior to Matthew's meeting with the guardian of the island. Additionally, if we look at David, he had good grades, no disciplinary problems prior to the change of custody in 2007. He's since been arrested twice, one for shoplifting and one for possession of drugs. He's been in drug and alcohol rehabilitation. During this time, he was allowed to drink alcohol on a cruise with his father. He was also, the arrest for possession of marijuana was during the time he was in drug and alcohol rehabilitation. His grades were B's, C's, and D's. He was involved in no extracurricular activities. And there were other incidents which showed that the plaintiff had basically adopted a laissez-faire attitude towards his children. That they were able to do pretty much whatever they wanted. They were basically on the run with very little parental supervision. After hearing the totality of the evidence, the trial court said for this court to award custody to Richard was due Matthew to failure. And I think that was a correct synopsis of the evidence. On the other hand, expert testimony was clear that there was no psychiatric reason to deny custody of her children to Brenda. That she was an intelligent, thoughtful mother who was appropriately concerned for their emotional, physical, spiritual, educational, and social welfare. Secondly, we are asking the court to reverse the trial court decision denying maintenance to Brenda and denying her motion for contempt. Maintenance was subject to review in February 2007. There was no order providing for maintenance that terminated at any date. The defendant correctly provided or filed a motion asking for a maintenance review in October 2006. We believe the trial court incorrectly placed the burden on Brenda to show efforts being self-sufficient without considering the other factors contained in 504 and 510. Sections 504 and 510 of the 750 ILCS. Specifically, subsequent to the last court order, she had developed a severe anxiety disorder, which was not only diagnosed by Dr. Lipschitz, but this diagnosis was agreed to by the plaintiff's expert, Dr. Angeline Stanislaus. In fact, when Dr. Lipschitz said that Brenda could not work at this time, that there was a light at the end of the tunnel, Dr. Stanislaus concurred and said that Brenda could not work as a floor nurse at this time. So even their expert agreed with the diagnosis of Dr. Lipschitz and as well concurred that there was some work that she could not do. She's been out of work since 1994, save a part-time job she recently had. She has anxiety disorder, heart disease, hypertension, depression, and diabetes. She is doing better. Dr. Lipschitz testified that she will be able to work at some time in the future. But due to these conditions that occurred after the last proceeding, after the appellate court review, she's not able to work at this time. And that's where we think that the trial court placed an unfair burden on her to show that she needed to be self-sufficient, because the trial court did not consider these other ailments which have occurred since the last court proceeding. And the trial court did not discuss the testimony of Dr. Lipschitz at all. In terms of the motion for contempt, we do not believe that Mr. Stern could of his own accord just quit pain maintenance. There was no order allowing him to do that. And certainly we believe that he was in contempt of that court order that ordered him to pay maintenance. There was no date of termination on that maintenance, and he had no right to cease paying that maintenance. Just briefly to discuss the delay issue that they've raised, I would state that Brenda had no reason to delay this case. She wanted to maintain the custody. The person that had a reason for delaying the case was Mr. Stern. And in terms of discovery, I'm not exaggerating when I tell the court that once I took over representation of Ms. Stern in February or March of 2009, we provided thousands of pages of documents to the plaintiff. We would provide medical reports and a week later get a request for updated medical reports. So in terms of what was provided, we provided thousands of pages of documents. And I would dare say 99% of them were probably of no use, never used at trial. We knew that we needed to get the case at trial. We did what we could to advance the matter at trial. We got the case, the depositions taken, and the custody and maintenance cases. We were ready to go in November of 2009, which was approximately eight months from when I entered my appearance on her behalf. They requested a continuance at that time. We never requested any continuances. The request for continuance was because during cross-examination of Dr. Kenneth Sproul and her evidence deposition, they elicited testimony from her that Brenda could not work due to heart palpitations. They then requested continuance so they could hire another expert to counter-dict that testimony that they had elicited. And then the case was continued for another five months. So we feel we did everything to bring this case to trial. Ms. Stern's prior counsel had appeared in November of 2008 to try the case and had no evidence depositions, had assumed that the report from Dr. Lipschitz would be sufficient to proceed with the case on maintenance, and was told that there was going to be an objection to that. He requested a continuance. The case was continued. He had some personal problems, which eventually led to his abandonment of the practice of law. But those things are not attributable to my client. And we do take issue with the trial court saying that we have delayed this matter because I don't think that that is true. That may be the perception the trial court had, but it's not based upon the facts and the evidence of this case. Let me ask you some questions here about your cross-appeal, which should have been filed with your original brief. I assume the Supreme Court ruled. I did file my cross-appeal. There was never nothing to the record that said nothing about cross-appeal on your brief? We just got the cross-appeal on September 22nd. Assets at dissolution, $843,000. Is that what she got, or is that the total assets of the family? That's what she received. She received $843,000. Yes. And then she got the maintenance, and you brought that down. You itemized all of that. And it says less assets at trial, estimated value of personal property, negative $10,000. I don't understand that. I believe you're looking at the trial's brief. I don't believe that's my brief. That's true. Okay, I'm sorry. All right. You tell me this, though. Okay. What were the monthly disbursements of $19,000 for 65 months? Do you know? I am not certain. We filed a financial statement, which was part of the record, which was used, which was based upon all the records she had, which showed she had monthly expenses of approximately $7,000, and she had approximately $2,500 in expenses for math. That is some arithmetic that they provided. I don't think that was part of the trial court record. In fact, I objected to that in my brief, I believe. Okay, so do you dispute that she received a total of $1,239,633 at the trial, at the end of the trial? I think it was $843,000. Well, when you brought in the child support and everything else. Oh, okay. No, I would not dispute that, no. But you didn't ever determine what this $19,000 a month disbursement was? That was not part of the trial court record, to the best of my knowledge. I'll ask Mr. Corcoran. Who were her prior attorneys? She had Terry Neubauer in the original proceeding. He withdrew. I don't even know when he withdrew. Terry Neubauer and Tom Kalowski. And Mr. Kalowski, I believe, has been disbarred. And at some point he had personal problems. And in other cases, similar cases. Thank you, counsel. Counsel? Let's start with the money. Okay. Well, the $843,000 is the total of the assets that she received at the dissolution. She got 55% and you got 45%. It's mentioned in the Rule 23 order previously. The maintenance and so forth is kind of undisputed, and the child support is. In her financial report that she submitted at the time of this latest trial, she had $46,000 in credit card debt and $117,000 of money she borrowed from a friend of hers. When I say less the assets of the trial, I was trying to look at the difference between what she had then and what she spent. So that $843,000 included some personal property. So she still had it. So I just put a $10,000 figure on it because it's not gone. I mean, I don't know if $10,000 might not be the right number. But the net change moving out the personal property was $1.2 million, and there has not been any explanation of what happened to it except that it was spent. I mean, there's no intention that she's hiding it someplace. It's just gone. What's the monthly disbursements of $19,000? How did you come up with that number? I divided $1.2 million by 65 months. It was very kind of disturbing. But the rest of the things that Minister Denny brought up are all dealt with at length in all of the briefs. And at the time when David was 18, he was living in the basement of Dr. Stern's house. He was an adult. There was some difficulty of keeping control over him. Dr. Stern was trying to keep control over the drugs more strictly than other things. And he's admitted in his testimony that he sort of thinks that was a bad tradeoff, but that's what he did. He's not the only parent that has allowed 18-year-olds to have sleepovers. And I don't know what else. Did she give any testimony of why she needed to borrow $117,000 when she received $843,000? She had already spent all that. I mean, that's what she needed in the last year or two. And was there information about what she spent it on, the $843,000? Well, they did provide us with a lot of her financial records, but we did not study through it because it was just too extensive. It was credit card statements and lots of payments. And there's some of it was income tax because she cashed in IRAs and things. But there's nothing to go for. We were surprised by Dr. Canestrero's statement that she had a physical ailment that prevented her from working. That was new to us, and it was supposedly heart palpitations. And so at that point, with an internist saying that heart palpitations kept her from working, we felt we had to have a doctor examine that. It turns out that she had all kinds of heart work-ups with a Dr. Pearson who was basically naked. And so our Dr. Osborne reviewed all that and interviewed her, examined her, and found that he didn't, in his opinion, there was no reason she couldn't work for physical reasons. Stanislaus was the only one we had about medical. Thank you. We appreciate the briefs and arguments of counsel. We'll take the case under advisement.